**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DEMETER HARVEST CORP. and** | § | |
| **PREMIER AIR CHARTER, INC.,** | § | |
|   Plaintiffs, | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-06285** |
| | § | |
| **EMPYREAL JET, INC., ELSA** | § | |
| **C. BELL, AND ANTONY S. BELL,** | § | |
|   Defendants. | § | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT AND**
**REQUEST FOR DECLARATORY JUDGMENT**

**I.**
**PARTIES**

1.     DEMETER HARVEST CORP. and PREMIER AIR CHARTER, INC. (hereinafter, collectively, "Plaintiffs"), Plaintiffs herein, hereby complain of EMPYREAL JET, INC. (hereinafter, "Empyreal"), ELSA C. BELL, and ANTONY S. BELL (hereinafter, the "Bells") (collectively, Empyreal and the Bells may be referred to herein as the "Defendants"), and in support thereof respectfully show the Court the following:

2.     Plaintiff Demeter Harvest Corp. ("Demeter") is a California corporation with a business address of 600 La Terraza Blvd., Escondido, California 92025.

3.     Plaintiff Premier Air Charter, Inc. ("Premier") is a California corporation with a business address of 2006 Palomar Airport Road, Suite 210, Carlsbad, CA 92011.

4.     Defendant Empyreal Jet, Inc. is a corporation duly organized and acting under the laws of the State of Texas, and has appeared and answered herein. Houston, Texas 77060.

5.    Defendants Elsa C. Bell and Antony S. Bell are married individuals who are, and at all times material hereto were, residents of Texas, and have appeared and answered herein. Upon information and belief, Defendant Antony S. Bell is employed as a First Officer for United Airlines. Upon information and belief, Defendant Elsa C. Bell serves as President of Empyreal and exercises direct operational control over Empyreal's day-to-day business.

## II.
## JURISDICTION AND VENUE

6.    This action is brought pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), as the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

7.    Venue is proper under 28 U.S.C. § 1391(b), as Defendants reside within this judicial district, and the events giving rise to the claims asserted herein all occurred within this judicial district.

8.    Moreover, the parties agreed to the exclusive jurisdiction of any federal, state, or local court within the State of Texas.

9.    Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure, as well as compensatory damages against Defendants, jointly and severally.

### III.
### BACKGROUND FACTS

10. At all times relevant to this Complaint, Demeter was and still is the equitable owner of a 1992 Gulfstream Aerospace Corporation G-IV SP Airframe bearing serial number 1202 and United States Registration Number N236CA, and two Rolls-Royce Deutschland Ltd. & Co KG Tay 611-8 engines bearing manufacturer's serial numbers 16504 and 16508 (collectively, the "Aircraft"), registered in the name of a different entity for the purposes of registration only.

11. Premier entered into a contractual relationship with Demeter under which Premier would take over the operation of the Aircraft following a short-term Lease to Empyreal.

12. Empyreal is an aircraft charter company. On or about December 29, 2023, Empyreal entered into a short-term aircraft lease, under which Empyreal obtained exclusive care, custody, possession and right to operational control of the Aircraft (hereinafter, the "Lease"). Prior to entering into the Lease, the Bells represented to Plaintiffs and/or their representatives that Empyreal had a "10 or more certification" under Part 135 of the Federal Aviation Regulations, that Empyreal had robust operations sufficient to operate the Aircraft, to satisfy all maintenance requirements, and to avoid the filing of liens against the Aircraft. These representations were false at the time they were made, as set forth more fully below.

13. On May 30, 2024, the original Lessor under the Lease transferred, assigned, conveyed and delivered to Demeter all right, title and interest in and to each and every claim and/or cause of action and right to recovery Lessor ever possessed as a result of Empyreal's acts, omissions, and/or breaches of the Lease, including any and all such claims arising from

contract, tort, and equity, at law, and/or any other claim and/or cause of action of any kind or nature whatsoever. The Lease specifically permits the assignment by Lessor set forth hereinabove, specifically in ¶ 17.7, which reads: "Assignment of Rights. This Agreement and the rights and obligations of the Parties shall inure to the benefit of, and be binding upon, their respective heirs, devisees, legatees, executors, administrators, trustees, successors, assigns and legal representatives. Lessee may not assign this Agreement (or any of its rights and obligations hereunder) without the prior written consent of Lessor."

14. Premier, under common ownership with Demeter, was and is responsible for every aspect of the operation of the Aircraft, including cost and expense related thereto, and Premier incurred and suffered damages as a result of Empyreal's breaches of the Lease. A Premier representative dealt with the Bells, electing to arrange for the short-term lease based upon representations made regarding the current and planned operation of the Aircraft.

15. As part of the Lease, Empyreal agreed to pay monthly rent as well as various other charges related thereto, including hourly engine program fees (described below). A true and correct copy of the Lease is attached hereto as Exhibit "A."

> "Lessee [Empyreal] shall also pay, or cause to be paid, at the Lessor's direction to Demeter Harvest Corp only, the periodic rent listed on Exhibit C . . ." (Exhibit "A").

Contrary to the express requirements of the Lease, Empyreal never paid Plaintiffs all of the rent and other payments due pursuant to the Lease. Indeed, Empyreal failed to make even the first rent payment due under the Lease.

Furthermore, the Lease required Empyreal to properly maintain the Aircraft:

"Lessee shall maintain or cause to be maintained all records, logs and other materials pertaining to the Aircraft and its maintenance . . . In accordance with all applicable FAA rules and regulations and in a manner that does not modify or impair any applicable warranties . . ." (Exhibit "A").

16. Due to Empyreal operating the Aircraft without Plaintiffs' consent, and refusing to return it upon demand following breach of the Lease, Plaintiffs incurred significant expenses and lost significant use of the Aircraft during the process of determining whether federally required maintenance and inspections were properly completed by Empyreal. The Lease provides events equating to default, the relevant provision stating: "Lessee breaches its obligation to pay the Basic Rent or any other sum when due and fails to cure such breach within ten (10) days." (Exhibit "A"). Not only did Empyreal refuse to pay all Basic Rent due and owing under the Lease, Empyreal failed to pay for the flight hours the Aircraft was used, refused to return the Aircraft to a location selected by Plaintiffs, refused to cooperate with the relinquishment of the Aircraft following breach of the Lease, refused to pay for or have performed all maintenance required to keep the Aircraft in an airworthy condition, refused to pay for downtime payments when the Aircraft was not being operated, refused to put the Aircraft in the condition it was supposed to be in upon its return to Plaintiffs, and otherwise failed to perform many of the obligations under the Lease it had entered into regarding the Aircraft.

17. Because Empyreal breached the Lease and other obligations it had in connection with the ongoing operation of the Aircraft, Plaintiffs had no alternative and were forced to repossess the Aircraft while it was on the ground at the Fort Lauderdale Executive Airport. The Bells made it very clear that there would be no cooperation of any kind or nature in resolving the many issues that had developed in short order in connection with the short-term Lease.

Upon repossessing the Aircraft, Plaintiffs discovered that all oxygen masks had been pulled or deployed, food was left out throughout the Aircraft, and tens of thousands of flies resided in the Aircraft. As a result, the Aircraft was inoperable and it took over a month to clean the Aircraft and restore it to a condition in which it could be inspected and repaired.

18. Plaintiffs incurred significant expenses in repossessing the Aircraft, interest on unpaid invoices, and attorneys' fees associated with repossessing the Aircraft and filing suit to recover damages incurred due to Empyreal's acts and omissions, including its multiple material breaches of the Lease.

19. Plaintiffs have incurred substantial cost and expense in ascertaining the condition and maintenance status of the Aircraft, including determining what repairs were required in order to ensure the Aircraft was airworthy, and effectuating such repairs in order that the Aircraft could be safely operated once again. Additionally, Plaintiffs have lost the use of the Aircraft from the date they first demanded return of the Aircraft until all required inspections and repairs had been completed.

**IV.**
**THE BELLS' PATTERN OF FRAUDULENT CONDUCT**

20. Upon information and belief, Defendant Antony S. Bell has a long and well-documented history of engaging in a recurring scheme to defraud aircraft owners in and around the Houston, Texas metropolitan area. The scheme operates as follows: Bell, in his capacity as a First Officer for United Airlines, obtains referrals from captains and other airline personnel to individuals seeking to purchase or operate high-dollar value aircraft. Bell, often employing his personal charm and British accent, convinces unsuspecting first-time aircraft purchasers to entrust their newly acquired aircraft to one of Bell's companies for

management, charter operations, and maintenance under Part 135 of the Federal Aviation Regulations. Once the aircraft owner has entrusted the aircraft to Bell's company, Bell and his wife Elsa Bell proceed to generate revenue from use of the aircraft while failing to satisfy the company's maintenance, insurance, rent, and other financial obligations, diverting funds that should have been used to properly operate the aircraft into their own personal accounts.

21.    The Bells' pattern is further characterized by the following: when the inevitable lawsuits, fraud allegations, and/or FAA administrative proceedings mount against the operating entity, the Bells abandon that entity—leaving it undercapitalized and unable to satisfy judgments—and acquire or form a new entity through which to continue their operations. Upon information and belief, the Bells have repeated this cycle with multiple entities over a period spanning more than a decade in the greater Houston area. Previous entities utilize for this purpose include, but may not be limited to, the following: Avion Aviation, LLC (formed 2011, forfeited its existence); Avion Aviation, LLC (formed 2019, still in existence); Avion Aviation Holding, LLC (formed 2011, forfeited its existence); Avion Jet (formed 2013, forfeited its existence); Capital Aerospace, LLC (formed 2006, forfeited its existence); Capital Aerospace Holding, LLC (formed 2011, forfeited its existence); and Air America Jet Charter, Inc. (formed 1994, forfeited its existence).

22.    As evidence of this pattern, Plaintiffs' counsel alone has been responsible for the repossession and/or foreclosure of no fewer than seven (7) aircraft from Empyreal and/or the Bells during the preceding approximate two-year period. In addition to the instant action and a companion case currently pending in Harris County District Court, there is other significant litigation pending against the Bells, including, but not limited to, the case

of *Sehbai Capital Group, Inc., et. al. v. Empyreal Jet, Inc., Antony Bell and Elsa Bell*, which involves substantially similar allegations of fraud, misrepresentation, and mismanagement spanning decades of the Bells' operations in the Houston area.

23. Upon information and belief, Empyreal has ceased or is in the process of ceasing all ongoing business operations, consistent with the Bells' established pattern of abandoning entities when liability becomes insurmountable, only to reconstitute operations through a new corporate form. Upon information and belief, the Bells have formed or are in the process of forming a new entity through which to continue the same or substantially similar operations.

24. Despite the mounting liabilities against them and their entities, the Bells continue to maintain an extravagant lifestyle, including, but not limited to, maintaining a large residence in the Champions area of Houston, Texas, and owning and operating high-dollar luxury and performance automobiles, including Lamborghini, Maserati, Jaguar, McLaren and other similar high-performance vehicles. Upon information and belief, the Bells' lavish lifestyle is funded, in whole or in part, by funds diverted from Empyreal and/or its predecessor entities that should have been used to satisfy the entities' obligations to aircraft owners, including Plaintiffs.

## V.
## CAUSES OF ACTION

25. Defendants' acts and omissions have given rise to the following causes of action:

## COUNT I
## Breach of Contract, Promissory Estoppel, and Duty to Indemnify
*(Against Defendant Empyreal Jet, Inc.)*

26. Plaintiffs incorporate by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

27. Plaintiffs will show that the foregoing constitutes breach of the Lease, and promissory estoppel as those terms are used and understood by the Courts of this state, and that Empyreal also had a duty to defend and indemnify Plaintiffs. Empyreal breached the Lease by failing to pay rent and other sums due under the Lease, failing to surrender possession of the Aircraft upon demand, failing to communicate with Plaintiffs, and failing to provide information reflecting the condition and maintenance status of the Aircraft.

28. As a result of Empyreal's breach of contract, promissory estoppel, and contractual duty to defend and indemnify, along with Plaintiffs' direct damages arising from breach of contract, Plaintiffs have suffered damages within the jurisdictional limits of this Court.

29. Additionally, pursuant to Tex. Civ. Prac. & Rem. Code §38.001 et seq., and in connection with the explicit contractual terms set forth in the Lease, Plaintiffs request that this Court, upon trial of this matter, award reasonable and necessary attorneys' fees, legal expenses, and costs of court incurred in seeking recovery for Empyreal's breach of contract and/or promissory estoppel and/or duty to indemnify Plaintiffs.

## COUNT II
## Declaratory Judgment
*(Against All Defendants)*

30.    Plaintiffs incorporate by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

31.    In addition to, and without prejudice to any other cause of action described herein, Plaintiffs seek a declaratory judgment as to the terms, rights, duties, obligations, status, and legal relations that arose under and by reason of the Lease or otherwise, pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure, as well as compensatory damages against Defendants, jointly and severally.

32.    Plaintiff has repossessed the Aircraft, pursuant to its rightful ownership of the Aircraft as shown above and stated in the Lease. (Exhibit "A"). Moreover, ¶ 17.12 of the Lease, pertaining to attorneys' fees, initially requiring that each party shall bear their own respective fees, costs and expenses of enforcing any right under the Lease, is in significant conflict with ¶ 15.1, under which Lessee is required to defend and indemnify Lessor, including reasonable attorneys' fees. Notably, the foregoing obligation for defense and indemnity applies directly to "Lessee's possession, maintenance or use of the Aircraft during the Lease Term," and it is beyond dispute that Plaintiffs are seeking to enforce such obligations against Empyreal and the Bells hereunder. Even further, ¶ 15.2(b) and (c) reinforce that Plaintiffs are unequivocally entitled to the rights to indemnification under this section, as well as their right to direct damages arising in contract from a material breach of Lessee's obligations under the Lease.

33. As such, a real and substantial controversy exists involving a genuine conflict of tangible interest which amounts to a justiciable controversy between the parties. Plaintiffs seek recovery of all attorneys' fees and legal expenses to the maximum extent permitted by law.

### COUNT III
### <u>Alter Ego – Corporate Veil Piercing</u>
*(Against Defendants Elsa C. Bell and Antony S. Bell)*

34. Plaintiffs incorporate by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

35. At all times relevant and material to this lawsuit, Empyreal was organized and operated as a mere tool, sham, or business conduit of Defendants Elsa C. Bell and Antony S. Bell (the "Alter Ego Defendants"). The Alter Ego Defendants are the owners and members of Empyreal. Defendant Elsa C. Bell is the President of Empyreal, as demonstrated by her signature on the Lease in her capacity as President. Defendant Antony S. Bell, upon information and belief, directly managed and controlled Empyreal's operations, including interactions with aircraft owners and prospective lessors, and directed the company's financial affairs.

36. The Alter Ego Defendants exercised direct operational control over Empyreal, dominating its management and decisions to the extent that the entity had no separate mind, will, or existence of its own. Specifically:

   (a) The Bells made all material business decisions for Empyreal, including the decision to enter into the Lease, the decision to cease making rent payments, and the decision to refuse to return the Aircraft;

(b) The Bells commingled Empyreal's funds with their personal funds, using Empyreal's operating accounts as their personal checkbook to fund their lavish lifestyle, including the acquisition and maintenance of luxury automobiles and a large personal residence in the Champions area of Houston, Texas;

(c) Upon information and belief, the Bells failed to maintain adequate corporate records, failed to observe corporate formalities, including failing to hold regular shareholder and board meetings, not keeping detailed minutes of those meetings, neglecting to file annual reports with state authorities, commingling personal and business funds by using separate bank accounts improperly, not documenting corporate actions or failing to keep accurate minutes of meetings, ignoring statutory requirements by skipping mandatory filings like annual reports, and failing to file necessary documents with the Secretary of State, treating corporate assets as personal property, such as using company funds for personal expenses without proper accounting, and disregarding Governance Structure, such as failing to elect directors, appoint officers, or conduct required votes on corporate matters;

(d) The Bells caused Empyreal to be undercapitalized relative to its obligations. Despite assuming responsibility for the operation, maintenance, and insurance of multiple high-dollar value jet aircraft—obligations routinely running into hundreds of thousands of dollars—Empyreal, upon information and belief, was undercapitalized at all times , rendering it incapable of satisfying its contractual obligations from inception;

(e) The Bells failed to maintain separation between Empyreal and their personal affairs, treating the corporation's revenue as their own personal income and diverting funds that should have been used to satisfy Empyreal's obligations under the Lease and other agreements into personal expenditures;

(f) Upon information and belief, the Bells have utilized a pattern of forming, operating, and abandoning successive corporate entities in the aviation industry in and around Houston, Texas, for the purpose of evading liabilities incurred through their operations, including but not limited to the formation of successor entities after prior entities became financially insolvent due to the Bells' own mismanagement and fraud.

37.    The Bells caused Empyreal to enter into the Lease with the intent to use the entity for the purpose of perpetuating a fraud, namely, to generate revenue for themselves from charter operations of the Aircraft while failing to cause Empyreal to pay its debts, including rent and maintenance obligations under the Lease, and while diverting such revenue for their direct personal benefit.

38.    The Alter Ego Defendants abused the corporate form by undercapitalizing Empyreal to perpetrate actual fraud on Plaintiffs for the Bells' direct personal financial benefit, including misrepresenting Empyreal's intention and ability to not only properly operate the Aircraft, but to comply with all of Empyreal's obligations arising under the Lease, including all financial obligations, none of which turned out to be true. Such actual fraud—defined as dishonesty of purpose or intent to deceive—involved intentional deception regarding Empyreal's intention and ability to fulfill its obligations under the Lease, directly

benefiting the Alter Ego Defendants by securing command and control over the Aircraft and its revenue without intent to perform, thereby causing Plaintiffs' economic injury.

39. The Alter Ego Defendants perpetuated a fraud for their own direct, personal benefit as the owners—and not for the entity—by usurping Empyreal's revenue for their benefit while failing to cause Empyreal to pay its debts. Unless the corporate veil is pierced, fraud or great injustice will be worked upon Plaintiffs. Therefore, the Alter Ego Defendants must be held personally liable, jointly and severally, for Plaintiffs' damages, including benefit-of-the-bargain losses, special or consequential damages, and attorneys' fees under any applicable rule and/or statute.

**COUNT IV**
**Fraud**
*(Against Defendants Elsa C. Bell and Antony S. Bell)*

40. Plaintiffs incorporate by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

41. **Material Misrepresentations.** Prior to and in connection with entering into the Lease, the Bells, acting individually and as officers, agents, and alter egos of Empyreal, made the following material misrepresentations to Plaintiffs and/or their authorized representatives:

(a)     On or about December, 2024, Defendant Antony Bell represented to Plaintiff's' representative Brian Kendrick that Empyreal held a "10 or more certification" under Part 135 of the Federal Aviation Regulations. This representation was material to Plaintiffs' decision to enter into the Lease, as a Part 135 certificate authorizing the operation of ten or more aircraft reflects a higher

level of FAA oversight, operational capability, and regulatory compliance. This representation was false at the time it was made;

(b)      On or about December, 2024, Defendant Antony Bell represented to both Brian Kendrick and Ross Gourdie that Empyreal had robust operations sufficient to operate the Aircraft, to satisfy all maintenance requirements, and to avoid the filing of liens against the Aircraft. This representation was false at the time it was made;

(c)      On or about December, 2024, Defendant Antony Bell represented to Brian Kendrick and Ross Gourdie that Empyreal had the financial ability and intention to make all rent payments due under the Lease. This representation was false at the time it was made, as evidenced by the fact that Empyreal failed to make even the first rent payment due under the Lease;

(d)      On or about December, 2024, Defendant Elsa Bell executed the Lease as President of Empyreal, ratifying the misrepresentations set forth hereinabove.

After issues arose regarding Empyreal's failure to pay rent and satisfy maintenance obligations, the Bells represented that they had negotiated certain payments from the prior owner and that Empyreal would not pay rent or maintenance until those payments were made. No such agreement had been made with the prior owner, and no such terms were incorporated into the Lease. This representation was false and was made to delay Plaintiffs' exercise of their contractual remedies.

42.      **Falsity and Scienter.** The Bells' representations set forth above were false at the time they were made. The Bells knew these representations were false, or made them recklessly as

positive assertions without knowledge of their truth, with the intent that Plaintiffs would rely upon them in entering into the Lease and entrusting the Aircraft to Empyreal. The Bells had no intention of causing Empyreal to perform under the Lease. Evidence of the Bells' fraudulent intent includes, but is not limited to, the following:

(a) Empyreal failed to make even the first rent payment due under the Lease, demonstrating that the Bells never intended for Empyreal to fulfill its financial obligations;

(b) On or about January, 2025, when a representative of the Lessor traveled to Los Angeles and informed Defendant Antony S. Bell that the representative had arrived to pick up the signed Lease, Bell was on the Aircraft and departed with it despite having agreed to provide the signed Lease at that time, demonstrating a deliberate pattern of evasion;

(c) Defendant Antony S. Bell met with a representative of the Lessor and stated that a wire payment was on the way, showing the representative, a cell phone screen purporting to show that a wire transfer had been initiated. This representation was false; the wire was never delivered;

(d) At the time the Bells induced Plaintiffs to enter into the Lease, Empyreal was already subject to multiple lawsuits, claims, and/or disputes with other aircraft owners arising from substantially similar conduct, and the Bells knew or should have known that Empyreal lacked the financial resources and operational capability to perform under the Lease;

(e) Plaintiffs' counsel alone has been responsible for the repossession and/or foreclosed based on default of no fewer than seven (7) aircraft from Empyreal and/or the Bells during the three-year period preceding the filing of this Complaint, reflecting a pattern of entering into lease and management agreements with no intention of performing;

(f) The Bells exercised dominion and control over funds generated from charter operations of the Aircraft that were intended to pay rent and maintenance obligations under the Lease, and directed such funds for their personal use and benefit rather than causing Empyreal to satisfy its obligations.

43.    **Justifiable Reliance.** Plaintiffs and/or their authorized representatives relied on the Bells' representations in entering into the Lease and entrusting the Aircraft to Empyreal. Such reliance was justifiable because Plaintiffs had no reason to believe that Empyreal would immediately default on the Lease, or any suspicion that the various representations were materially false, especially since Empyreal just recently purchased four (4) Hawker aircraft that had gone into default while owned by the entity who sold the Aircraft to Demeter. Plaintiffs would not have entered into the Lease or entrusted the Aircraft to Empyreal absent these representations.

44.    **Causation and Damages.** As a direct and proximate result of the Bells' fraud, Plaintiffs have suffered damages in excess of $500,000, including but not limited to: unpaid rent and other sums due under the Lease; costs and expenses of repossessing the Aircraft; costs of cleaning, inspecting, repairing, and restoring the Aircraft to airworthy condition; loss of use of the Aircraft from the date of demand for return through completion of all required

inspections and repairs; costs of removing or satisfying liens filed against the Aircraft due to Empyreal's failure to pay its obligations; loss of engine maintenance program coverage; and attorneys' fees and legal expenses. Had the Bells not made the false representations set forth above, Plaintiffs would never have entrusted the Aircraft to Empyreal and would not have suffered these damages.

45.    **Willful and Malicious Conduct.** The Bells' conduct was willful and malicious, involving actual awareness of the falsity of their representations and specific intent to cause injury to Plaintiffs and/or Plaintiffs' property. The Bells acted with intent to deprive Plaintiffs of the Aircraft, the revenue from the Aircraft including rent and maintenance payments, and costs to remove liens, and converted the Aircraft and the revenue therefrom for their own use and benefit. Plaintiffs are entitled to exemplary damages.

**COUNT V**
**<u>Conversion</u>**
*(Against All Defendants)*

46.    Plaintiffs incorporate by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

47.    Plaintiffs owned, had possessory rights to, and/or had the right to immediate possession of the Aircraft and the revenue generated from the operation thereof, including rent and maintenance payments due under the Lease.

48.    Defendants, without authorization and in violation of the Lease, unlawfully assumed and exercised dominion and control over the Aircraft and the revenue therefrom, to the exclusion of and inconsistent with Plaintiffs' rights as owners and lessors. Specifically, Defendants continued to operate the Aircraft after breach of the Lease, refused to surrender

possession upon demand, diverted revenue from charter operations for the Bells' personal use rather than paying Plaintiffs' rent and maintenance obligations, and allowed liens to be filed against the Aircraft.

49.    As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered damages in an amount to be proved at trial, including but not limited to the fair market value of the use of the Aircraft during the period of unauthorized possession, lost revenue, costs of repossession, and costs of restoring the Aircraft to airworthy condition.

**COUNT VI**
**<u>Civil Conspiracy</u>**
*(Against All Defendants)*

50.    Plaintiffs incorporate by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

51.    Defendants Antony S. Bell, Elsa C. Bell, and Empyreal, acting in concert and by agreement, combined to accomplish the unlawful purpose of defrauding Plaintiffs by inducing Plaintiffs to enter into the Lease and entrust the Aircraft to Empyreal based on false representations, with the intent of generating revenue from the Aircraft for the Bells' personal benefit while failing to satisfy Empyreal's obligations under the Lease.

52.    In furtherance of this conspiracy, one or more of the Defendants committed the following overt acts: making false representations regarding Empyreal's Part 135 certification, operational capability, and financial ability; entering into the Lease without intent to perform; failing to make rent and maintenance payments while operating the Aircraft for revenue; diverting Empyreal's funds for the Bells' personal use; refusing to return the Aircraft upon demand; and abandoning the Aircraft in an inoperable condition.

53. As a direct and proximate result of this conspiracy, Plaintiffs have suffered damages in an amount to be proved at trial.

**COUNT VII**
**Voidable Transactions (Texas Uniform Fraudulent Transfer Act)**
*(Against Defendants Elsa C. Bell and Antony S. Bell)*

54. Plaintiffs incorporate by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

55. At all times relevant hereto, Plaintiffs were creditors of Empyreal by virtue of Empyreal's obligations under the Lease, including, but not limited to, unpaid rent, maintenance obligations, indemnification obligations, and other sums due and owing.

56. Upon information and belief, while Empyreal was indebted to Plaintiffs and/or while Empyreal was insolvent or was rendered insolvent thereby, the Bells caused Empyreal to transfer assets, including revenue generated from charter operations of the Aircraft and other aircraft under Empyreal's management, to themselves and/or for their personal benefit, without Empyreal receiving reasonably equivalent value in exchange. Such transfers include, but are not limited to, transferring funds that should have been applied to Empyreal's debt and/or other financial obligations, refusing to fund Aircraft related maintenance such as maintenance service plans, and the stated using such funds for personal purposes only, pocketing revenue from third-party charter flight operations instead of paying the charter operator holding the certificate under which the charter flight operations were conducted, transferring assets to family members or insiders (such as a spouse) to shield them from creditors, selling property for significantly less than its market value, gifting valuable items like jewelry, real estate, and/or automobiles without receiving

reasonably equivalent value, transferring funds into a spouse's bank account after a judgment is obtained, concealing transfers from creditors, and retaining possession or control of property after ostensibly transferring it to another party.

57.     The foregoing transfers were made with actual intent to hinder, delay, or defraud Empyreal's creditors, including Plaintiffs. The following badges of fraud are present: (a) the transfers were made to insiders, namely the Bells as owners and officers of Empyreal; (b) before and after the transfers, the Bells retained control of the transferred assets through their personal accounts; (c) the transfers were made after Empyreal had been sued or threatened with suit by multiple aircraft owners, or persons seeking to acquire an aircraft; (d) upon information and belief, Empyreal was insolvent at the time of the transfers or became insolvent shortly thereafter; (e) the transfers were not disclosed to Plaintiffs or other creditors; and (f) the Bells received the transfers for no reasonably equivalent value to Empyreal.

58.     In the alternative, the foregoing transfers constitute constructive fraud under TEX. BUS. & COM. CODE §24.006, as they were made without Empyreal receiving reasonably equivalent value in exchange, and at a time when Empyreal was engaged in or was about to engage in a transaction for which its remaining assets were unreasonably small in relation to the transaction, or Empyreal intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

59.     Pursuant to TEX. BUS. & COM. CODE §24.008, Plaintiffs seek avoidance of the foregoing transfers, attachment or garnishment against the transferred assets, an injunction against

further disposition of the transferred assets, appointment of a receiver to take charge of the transferred assets, and any other relief the circumstances may require.

## COUNT VIII
### Theft Liability (TEX. CIV. PRAC. & REM. CODE § 134.001 et seq.)
*(Against All Defendants)*

60.     Plaintiffs incorporate by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

61.     Defendants unlawfully appropriated the Aircraft and the revenue therefrom with the intent to deprive Plaintiffs of their property. Defendants obtained and exercised control over the Aircraft and its revenue by deception, namely through the false representations set forth above regarding Empyreal's Part 135 certification, operational capabilities, and intent and ability to perform under the Lease. Defendants' conduct constitutes theft as defined by TEX. PENAL CODE §31.03, incorporated by reference into the Texas Theft Liability Act.

62.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 134.005, Plaintiffs are entitled to recover actual damages, additional damages not to exceed $1,000, court costs, and reasonable and necessary attorneys' fees.

## COUNT IX
### Constructive Trust
*(Against Defendants Elsa C. Bell and Antony S. Bell)*

63.     Plaintiffs incorporate by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

64.     As set forth above, the Bells, individually and through Empyreal, obtained funds and property belonging to or owed to Plaintiffs through actual fraud, breach of fiduciary duty,

and/or unjust enrichment. Specifically, the Bells diverted revenue generated from charter operations of the Aircraft—funds that should have been used to satisfy Empyreal's rent, maintenance, engine program, and other obligations under the Lease—and appropriated such funds for their own personal use and benefit.

65.     Upon information and belief, the Bells used the diverted funds to acquire, improve, or maintain identifiable assets, including but not limited to: the Bells' personal residence located in the Champions area of Houston, Texas; one or more Lamborghini and/or other high-performance luxury automobiles; and other personal property and assets.

66.     The Bells acquired and/or maintained these assets, in whole or in part, with funds that in equity and good conscience belong to Plaintiffs. The Bells would be unjustly enriched if permitted to retain these assets or the proceeds thereof. Plaintiffs are entitled to the imposition of a constructive trust upon the assets acquired by the Bells with funds diverted from Empyreal that should have been paid to Plaintiffs under the Lease, including any traceable proceeds thereof.

67.     Plaintiffs request that the Court: (a) impose a constructive trust upon all assets acquired or maintained by the Bells, directly or indirectly, with funds diverted from Empyreal that were owed to Plaintiffs; (b) order an accounting of all funds received by the Bells from Empyreal during the relevant time period; (c) order the Bells to disgorge all amounts wrongfully obtained; and (d) grant such other equitable relief as the Court deems just and proper.

**COUNT X**
**Bailment**
*(Against all Defendants)*

68.    Plaintiffs incorporate by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

69.    Plaintiffs deliver the Aircraft to Empyreal in the condition required for under the terms and conditions of the Lease, without objection by Empyreal or the Bells, creating a bailment situation, as that term is used and understood by the courts of this State.

70.    The Lease created a a bailment when such personal property is delivered and accepted by another with the expectation that it will be returned. There are generally two duties owed by a bailee to the bailor: (1) the duty of ordinary or reasonable care; and (2) the duty to return the property to the bailor.

71.    The elements of bailment are (1) the delivery of personal property from one person to another for a specific purpose; (2) acceptance by the transferee of such delivery; (3) an agreement that the purpose will be fulfilled; and (4) an understanding that property will be returned to the transferor. A bailment is for the mutual benefit of the parties as long as the property of the bailor is delivered to and accepted by the bailee as an incident of a business in which the bailee makes a profit.

72.    `In a bailment for the mutual benefit of the parties, and in the absence of a special contract, the bailee is held to an ordinary or reasonable degree of care. A bailee's common law liability to a bailor for loss or damage to the bailed property is limited to the consequences of the bailee's fault or negligence.

73.   The bailment relationship is "governed by principles of negligence. That is, the bailment contract gives rise to a duty on the part of the bailee, and, in the case of a bailment for mutual benefit of the parties, that duty is to take reasonable care in safekeeping the property that is the subject matter of the bailment. In addition, "[t]he bailee has an obligation to return the property to the bailor when the purpose of the bailment has ended or to keep the property until the bailor reclaims it.

74.   The Defendants did not return the Aircraft in the condition it was tendered to Defendants, accordingly Plaintiffs hereby seek recovery of all their damages under the legal theory of bailment as set forth herein.

## VI.
## DAMAGES

75.   Plaintiffs seek monetary damages in excess of $500,000, excluding attorneys' fees, costs, and interest. Plaintiffs' damages include but are not limited to:

  (a)  Unpaid rent and other sums due and owing under the Lease;

  (b)  Costs and expenses of repossessing the Aircraft at Fort Lauderdale Executive Airport;

  (c)  Costs of cleaning, inspecting, repairing, and restoring the Aircraft to airworthy condition, including remediation of the condition in which Defendants left the Aircraft;

  (d)  Loss of use of the Aircraft from the date of demand for its return through completion of all required inspections and repairs;

  (e)  Costs of removing or satisfying liens filed against the Aircraft as a result of Defendants' failure to pay obligations incurred during their possession;

  (f)  Loss of engine maintenance program coverage and costs of reinstating or replacing such coverage;

(g) Hourly engine program fees and downtime payments that Empyreal failed to pay, resulting in ;

(h) Interest on all unpaid sums;

(i) Exemplary damages for Defendants' willful and malicious conduct; and

(j) All such other damages as may be proved at trial.

76.    Moreover, Plaintiffs also plead, and will prove, their right to recover special damages, including incidental and consequential damages, all associated with Defendants' breach of the Lease, fraud, conversion, and other acts and omissions set forth with particularity herein.

## VII.
## ATTORNEYS' FEES

77.    The preceding is incorporated by reference as if fully copied and set forth at length. As a result of the events giving rise to this complaint, Plaintiffs have been required to retain the services of counsel to prosecute this action. Plaintiffs additionally sue for reasonable attorneys' fees and legal expenses for the prosecution of this action to judgment and for any appeal therefrom, pursuant to TEX. CIV. PRAC. & REM. CODE §38.001 et seq., the terms of the Lease, the Texas Theft Liability Act, the Texas Uniform Fraudulent Transfer Act, and any other applicable statute or rule.

## VIII.
## RESERVATION OF RIGHTS

78.    Plaintiffs reserve the right to amend these pleadings as additional facts are developed through discovery.

## IX.
## DEMAND FOR JURY TRIAL

79.    Plaintiffs hereby demand a trial by jury on all issues so triable.

## X.
## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs DEMETER HARVEST CORP. and PREMIER AIR CHARTER, INC. respectfully request:

a.    That the Court, upon final hearing, enter a declaration as to the rights and responsibilities of the parties to the Lease, further declaring and finding that the acts and omissions of Defendants have caused Plaintiffs damages, jointly and severally;

b.    That the Court award compensatory damages to Plaintiffs and against Defendants in an amount to be proved at trial, jointly and severally;

c.    That Defendants Elsa C. Bell and Antony S. Bell be held personally liable for all damages as alter egos of Empyreal Jet, Inc., jointly and severally;

d.    That the Court award Plaintiffs special damages, including incidental and consequential damages, jointly and severally;

e.    That the Court award Plaintiffs exemplary and enhanced damages to the maximum extent permitted by law, jointly and severally;

f.    That the Court avoid and set aside the voidable transfers identified herein and grant such further relief under the Texas Uniform Fraudulent Transfer Act as may be appropriate, jointly and severally;

g.    That the Court impose a constructive trust upon all assets acquired or maintained by Defendants Elsa C. Bell and Antony S. Bell with funds diverted from Empyreal that were owed to Plaintiffs, order an accounting, and order disgorgement of all amounts wrongfully obtained and/or retained by these Defendants, jointly and severally;

h.    Pre-judgment and post-judgment interest in the maximum amounts provided by law, jointly and severally;

i.    Court costs, including reasonable attorneys' fees, under all applicable law including the Lease, TEX. CIV. PRAC. & REM. CODE §38.001, and the Texas Theft Liability Act, jointly and severally; and

j.        All such other and further relief, general or special, at law or in equity, to which Plaintiffs may show themselves to be justly entitled, jointly and severally.

Dated: April 8, 2026

Respectfully submitted,

**TEXAS AVIATION LAW, P.C.**

By: */s/* **_Gary L. Evans_**

Gary Linn Evans
State Bar No. 00795338
E-mail: evans@texasaviationlaw.com
P.O. Box 1007
New Waverly, Texas 77358
Telephone: (866) 739-5554
Direct: (832) 541-8037
Facsimile: (832) 553-8037

**ATTORNEY FOR PLAINTIFFS**
**DEMETER HARVEST CORP. &**
**PREMIER AIR CHARTER, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this document on the 8th day of April, 2026, and that a true and correct copy of the foregoing **PLAINTIFFS' FIRST AMENDED COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT** was served on all known counsel of record via CM/ECF system for the United States District Court for the Southern District of Texas, and/or via e-mail.

Richard J. Judge, Jr.                                    *Via CM/ECF and/or E-mail Only*
**HOPKINS CENTRICH LAW**
8701 New Trails, Suite 200
The Woodlands, Texas 77381
Telephone: 281-210-0140
Facsimile: 832-202-0399
rjudge@hopkinscentrich.com

**Attorneys for Defendants**

                                                        */s/ Gary L. Evans*
                                                        Gary L. Evans

Exhibit "A"

## GULFSTREAM AEROSPACE G-IV
## SN 1202
## AIRCRAFT DRY LEASE AGREEMENT

BETWEEN

### CYPRESS COVE AIR, LLC
**An Arizona Limited Liability Company**

AND

### EMPYREAL JET, INC.
**A Texas Corporation**

**EFFECTIVE DATE**

**29 DEC 2023**

---

### INSTRUCTIONS TO COMPLY WITH TRUTH-IN-LEASING REQUIREMENTS

1. If the maximum take-off gross weight of the aircraft is greater than 12,500 lbs., mail a copy of the lease to the following address via certified mail, return receipt requested, immediately upon execution of the lease (14 C.F.R. 91.23 requires that the copy be sent within twenty-four hours after it is signed):

   Federal Aviation Administration
   Aircraft Registration Branch
   ATTN: Technical Section
   P.O. Box 25724
   Oklahoma City, Oklahoma 73125

2. If the maximum take-off gross weight of the aircraft is greater than 12,500 lbs., telephone the nearest Flight Standards District Office at least forty-eight hours prior to the first flight hereunder.

3. Carry a copy of the lease in the aircraft at all times. Each flight under the Lease should be reflected in the Aircraft's Log as:

   **FLIGHT FOR EMPYREAL JET, INC. (OPERATOR) PURSUANT TO AIRCRAFT DRY LEASE AGREEMENT DATED** 1/29/24 .

---

Dry Lease Agreement

N236CA

# AIRCRAFT DRY LEASE AGREEMENT

This **AIRCRAFT DRY LEASE AGREEMENT** (this "*Agreement*") is restated to memorialize the terms of the agreement by the parties as of 29 December 2023 (the "*Effective Date*"), by and between **CYPRESS COVE AIR, LLC,** an Arizona limited liability company ("*Lessor*"), and **EMPYREAL JET, INC.,** a Texas corporation ("*Lessee*").

## RECITALS

**WHEREAS,** LESSOR RIGHTFULLY OWNS THAT CERTAIN GULFSTREAM AEROSPACE G-IV MODEL AIRCRAFT, U.S. REGISTRATION NUMBER N236CA AND BEARING MANUFACTURER'S SERIAL NUMBER 1202, INCLUDING ITS ROLLS-ROYCE DEUTSCHLAND LTD & CO KG TAY 611-8 ENGINES BEARING MANUFACTURER'S SERIAL NUMBERS 16504 AND 16508 (EACH OF WHICH ENGINES HAVING AT LEAST 550 RATED TAKEOFF HORSEPOWER OR THE EQUIVALENT THEREOF), AND ALL OTHER APPLIANCES, AVIONICS, PARTS, ADDITIONS, ACCESSORIES, INSTRUMENTS, COMPONENTS AND OTHER ITEMS OF EQUIPMENT NOW INSTALLED THEREON, AND ALL FLIGHT MANUALS, LOG BOOKS AND RECORDS REQUIRED BY THE UNITED STATES FEDERAL AVIATION ADMINISTRATION ("*FAA*"), RELATING TO SAID AIRCRAFT, ENGINES, AND COMPONENTS (COLLECTIVELY, THE "*AIRCRAFT*"); AND

**WHEREAS,** Lessee desires to use the Aircraft and has requested that Lessor make the Aircraft available to Lessee for its use; and

**WHEREAS,** Lessor is willing to make the Aircraft available to Lessee but only in accordance with and subject to the terms and conditions of: (1) this Agreement, and (2) as a dry lease (i.e., without flight or cabin crew).

**NOW, THEREFORE,** in consideration of the mutual covenants and promises herein contained and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, Lessor and Lessee hereby agree as follows:

## AGREEMENT

1. DEFINITIONS. As used herein, the following terms shall have the following meanings:

"*FARs*" means United States Federal Aviation Regulations.

"*Lease Operations*" means, Lessee's possession, use or operation of the Aircraft pursuant to this Agreement.

"*Operating Base*" means **Houston, TX**

"*Party*" or "*Parties*" means, individually and collectively, as the context requires, Lessor and Lessee.

**2.    LEASE OF AIRCRAFT; DELIVERY.** Lessor hereby agrees to lease the Aircraft to Lessee on an exclusive basis and Lessee hereby agrees to lease the Aircraft from Lessor subject to the terms and conditions set forth herein. Prior to the Lease Operations, Lessor shall deliver the Aircraft to Lessee at the Operating Base or at such other location as is mutually agreed to by Lessor and Lessee, with all Aircraft records, logs and other materials required by the FAA or the United States Department of Transportation (the "**DOT**") with respect to the maintenance and operation of the Aircraft and in compliance with all Delivery Conditions (as set forth on **Exhibit A**). Lessee shall be deemed to have accepted the Aircraft and be satisfied with the condition thereof upon commencement of each Lease Operation.

**3.    TERM OF AGREEMENT.**

**3.1** The initial term of this Agreement shall commence on the date of this Agreement and shall continue in full force for a period of 12 months thereafter from the Effective Date until terminated pursuant to **Section 16** (the "**Lease Term**").

**4.** Lease Payments

**4.1** Lessee shall pay, or cause to be paid, directly to the provider thereof, all costs, expenses, fees, and charges incurred in connection with the Lease Operations as such arise during the Lease Term as set forth herein.

**4.2** Lessee shall also pay, or cause to be paid, at the Lessor's direction to Demeter Harvest Corp only, the periodic rent listed on **EXHIBIT C** attached hereto (the "**Basic Rent**") by electronic transfer of immediately available funds, deposited no later than the date due, to a Demeter Harvest Corp. account designated in writing by Lessor, which Demeter Harvest account may be revised or designate a new account from time to time during the Lease Term.

**4.3** Lessee shall also pay, or cause to be paid, Lessee Expenses (as set forth on **Exhibit C**) within thirty (30) days after receipt of Lessor's written invoice therefor, directly to the vendor or to Lessor at Lessor's address (as set forth on the signature page hereof) or Demeter Harvest at Lessor's direction.

**4.4** Lease payments will commence upon the Lessee's first use of the Aircraft on January 29, 2024. Lease payments for partial months will be prorated by a ratio of the number of days in the partial month the Aircraft is leased over the total number of days in the calendar month.

**5.    TAXES**

Lessor shall be liable for and shall report and pay promptly all taxes, fees and assessments imposed, assessed or levied against the Aircraft (or purchase, ownership, delivery, leasing, possession, use or operation thereof), or this Agreement (or any rents or receipts hereunder). Any sales tax due from the lease of the Aircraft will be owed by the Lessee to the Lessor and the Lessor shall collect and remit.

**6.    SCHEDULING AND CANCELLATIONS.** Lessee shall have exclusive control of the Aircraft during the Lease Term.

7.    **MAINTENANCE RESPONSIBILITY.** At all times during the Lease Term:

7.1    Subject to caps of maximum financial liability for said maintenance as set forth in the pricing and terms agreed by the Parties, Lessee shall be responsible up to financial caps set forth herein for the servicing, repair, inspection, maintenance and overhaul of the Aircraft during the Lease Term. The Aircraft shall be maintained, inspected, serviced, repaired, overhauled and tested in accordance with: (i) all maintenance manuals initially furnished with the Aircraft, including any subsequent amendments or supplements to such manuals issued by the manufacturer from time to time, (ii) all statutes, laws, ordinances, regulations and standards or directives issued by any governmental agency applicable to the maintenance of the Aircraft, including (A) all mandatory or otherwise required service bulletins issued, supplied, or available by or through the applicable manufacturer, and (B) all airworthiness directives applicable to the Aircraft issued by the FAA (and causing such directives and bulletins to be completed through corrective modification in lieu of operating manual restrictions, when and to the extent commercially reasonable).

7.2    Lessee shall maintain or cause to be maintained all records, logs and other materials pertaining to the Aircraft and its maintenance (including any computerized maintenance records) in accordance with all applicable FAA rules and regulations and in a manner that does not modify or impair any applicable warranties.

7.3    All maintenance procedures shall be undertaken and completed in accordance with the manufacturer's recommended procedures, and by properly trained, licensed, and certificated maintenance sources and maintenance personnel, so as to keep the Aircraft, each engine and every component and system of each: (i) in as good operating condition and appearance as when delivered to Lessee hereunder, ordinary wear and tear excepted, and (ii) in such operating condition as may be necessary to enable the U.S. FAA Standard Airworthiness Certificate (and any other applicable certificate, license, registration or authorization) to be maintained in good standing at all times during the Lease Operations. Lessee shall be liable to Lessor for (i) any direct damage to the Aircraft which occurs in connection with the Lease Operations or (ii) any abuse or misuse of the Aircraft which may compromise, prejudice, or invalidate any of the manufacturer's and supplier's warranties applicable to the Aircraft, which in either (i) or (ii) above is attributable to the negligence or willful misconduct of Lessee or any employee, agent and/or guest thereof during any Lease Operations, reasonable wear and tear excepted, except to the extent such loss or damage is covered by the insurance policies described in **Section 14**.

7.4    Any service, repair and maintenance shall take precedence over scheduling of the Aircraft for Lease ●perations, unless such can be safely deferred in accordance with applicable laws and regulations. Lessor warrants and represents there is no major scheduled maintenance or downtime for the Aircraft during the Term of the Lease.

7.5    Lessor shall, at Lessor's cost and expense, replace or have repaired appliances, parts, instruments, appurtenances, accessories, furnishings, and other equipment or components of the Aircraft that may have become worn out, lost, stolen, destroyed, damaged or otherwise rendered unfit for use for any reason whatsoever. All such replacements or repairs installed on or incorporated into the Aircraft shall upon such installation or incorporation become the property of Lessor.

**7.6**  Lessee shall not make any change in the configuration, appearance or coloring of the Aircraft from that in effect at the beginning of the Lease Term, other than changes mandated by the FAA or consented to in writing by Lessor.

**7.7**  Any repair, alteration or modification made to the Aircraft and any replacement parts, including any replacement engine, installed thereon in the course of repairing or maintaining the Aircraft, shall be deemed an accession, and title thereto shall be immediately vested in Lessor without Lessor incurring any cost or expense.

**7.8**  Lessor agrees, at its own cost and expense, to cause the Aircraft to be kept marked with the U.S. registration number specified above, and replace promptly any such Aircraft marking which may be removed, defaced or destroyed.

**7.9**  If, and so long as, no Event of Default exists under this Agreement, Lessee shall, and hereby is, authorized to assert and enforce, at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear, whatever claims and rights Lessor may have under any warranties applicable to the Aircraft.

## 8.    OPERATIONAL CONTROL.

**8.1**  IT IS THE INTENT OF LESSOR AND LESSEE THAT THIS AGREEMENT CONSTITUTES A DRY LEASE.

**8.2**  Lessee shall have complete and absolute "operational control" of the Aircraft and shall maintain "possession, command and control" of the Aircraft (as determined by the Internal Revenue Service) during the Lease Operations. *"Operational control"* as defined in 14 C.F.R. Section 1.1 and for the purpose of this Agreement, with respect to a flight, means the exercise of authority over initiating, conducting or terminating a flight, and for the purposes of this Agreement shall include, without limitation, Lessee, (i) at Lessee's sole expense, locating and retaining (either through direct employment or contracting with an independent contractor for flight services) a duly-qualified flight crew (the *"Flight Crew"*), and selecting the Pilot-In-Command and (ii) being responsible for all other physical and technical aspects of operating the Aircraft during and in connection with any Lease Operations, including, without limitation, maintenance, release, flight planning, flight scheduling, flight following, communications, weather, weight and balance, and fueling.

**8.3**   The Aircraft shall be operated at all times in compliance with, and all Flight Crew shall be appropriately certified, rated and trained in compliance with (i) all applicable FARs, and (ii) the terms and conditions of the insurance policies described in **Section 14**.

**8.4**   The Aircraft shall not be operated in any geographic location excluded from coverage under the insurance policies.

**8.5**   The Aircraft shall not be used for any illegal purpose or in any manner that could subject the Aircraft to confiscation.

**8.6**   A copy of this Agreement, and a current and valid AC Form 8050-1 or AC Form 8050-3 will be kept on the Aircraft at all times during each Lease Operation.

**8.7**     It is understood and agreed by Lessee that Lessee's use of the Aircraft for Lessee's Lease Operations shall be for Lessee's own account as provided in any part of FAR Part 91 or as otherwise agreed or Part 119 and Part 135 as may be applicable.

**8.8**     Throughout the Lease Term, Lessee will not use or operate and will not permit the Aircraft to be used or operated "predominantly" outside the United States as that phrase is used in Section 168(g)(1)(A) of the Internal Revenue Code.

**8.9**     Lessor shall notify the nearest Flight Standards District Office of operations unless otherwise agreed and provided by Lessee.

**9.**     INSPECTION. Lessor, or its designee, shall have the right to inspect the Aircraft and the Aircraft records during the Lease Term at any reasonable time, upon reasonable notice, and to make copies of any such records. Lessee shall provide to Lessor any information reasonably requested by Lessor with respect to the location, condition, use and operation of the Aircraft.

**10.**     LEGAL TITLE TO THE AIRCRAFT. Legal title to the Aircraft shall remain in, and the Aircraft shall remain registered to Lessor. Lessee shall not create, incur, assume or suffer to exist any lien or other encumbrance with respect to the Aircraft or take any action that would otherwise dilute Lessor's unrestricted title to and ownership of the Aircraft. Lessee shall not transfer, assign, charter, sublease, convey, mortgage or otherwise encumber Lessee's or Lessor's interest in or to the lease or the Aircraft, and any attempt to do any of the foregoing without Lessor's prior written consent, whether by operation of law or otherwise, shall be null and void. Upon request of Lessor, Lessee agrees to promptly provide information related to crewmembers of the Aircraft and the Aircraft's operations on specific dates, the location of the Aircraft, and the maintenance and other aircraft records for the Aircraft. Lessee further agrees to (a) provide reasonable cooperation to Lessor and the FAA in an expeditious manner with respect to any request from the FAA or other applicable governmental entity for information and access to records of the Aircraft, and (b) authorize the FAA or any other duly authorized air authority representatives of the U.S. or the government where Lessee is habitually based or operated, upon any request which the FAA or such other governmental entity is legally entitled to make under law applicable to Lessee, to inspect the Aircraft.

**11.**     RETURN CONDITIONS. Lessee agrees to return the Aircraft to Lessor, at the termination of the Lease Operations in accordance with its terms , at the Aircraft's Operating Base or such other location as is mutually agreeable to Lessor and Lessee, free and clear of all liens and encumbrances created by Lessee and in compliance with all Return Conditions (as set forth on **Exhibit B**) and with all Aircraft records, logs and other materials previously delivered to Lessee. The Aircraft will be in as good an operating condition as exists at the time of delivery to Lessee, normal wear and tear excepted, undamaged, with all systems functioning properly. Any exceptions or deviations from the required Return Conditions shall be identified by Lessee to Lessor and listed in the Aircraft or engine logbook, as necessary to comply with all applicable FARs.

**12.**     REPRESENTATIONS AND WARRANTIES OF LESSOR. **THE AIRCRAFT IS LEASED TO LESSEE BY LESSOR HEREUNDER "AS-IS" AND LESSOR SHALL NOT BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, EXCEPT THAT LESSOR WARRANTS TITLE AND AIRWORTHINESS and** that Lessor represents and warrants to Lessee as follows:

**12.1** Lessor has the absolute and unrestricted right, power and authority to enter into and perform its obligations under this Agreement, and the execution and delivery of this Agreement by Lessor have been duly authorized by all necessary action on the part of Lessor. This Agreement constitutes a legal, valid and binding obligation of Lessor, enforceable in accordance with its terms.

**12.2** Lessor is an Arizona limited liability company and has all necessary power and authority under applicable law and Lessor's organizational documents to own or lease Lessor's properties and to carry on Lessor's business as presently conducted.

**12.3** Lessor is a "citizen of the United States" as defined in Section 40102(a)(15) of Title 49, United States Code.

**13.    REPRESENTATIONS AND WARRANTIES OF LESSEE.** Lessee hereby represents and warrants to Lessor as follows:

**13.1** Lessee has the absolute and unrestricted right, power and authority to enter into and perform its obligations under this Agreement, and the execution and delivery of this Agreement by Lessee have been duly authorized by all necessary action on the part of Lessee. This Agreement constitutes a legal, valid and binding obligation of Lessee, enforceable in accordance with its terms.

**13.2** Lessee is a Texas corporation and has all necessary power and authority under applicable law and Lessee's organizational documents to own or lease its properties and to carry on Lessee's business as presently conducted.

**13.3** Lessee is a "citizen of the United States" as defined in Section 40102(a)(15) of Title 49, United States Code.

**13.4** Other than as is described on the cover page of this Agreement, Lessee shall not make any filings or registrations with respect to this Agreement or the Aircraft at the FAA (or at the International Registry pursuant to the Convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment) unless consented to in writing by Lessor.

**14.    INSURANCE.** Lessor will maintain, or cause to be maintained and Lessee will pay and in effect, at all times during the Lease Term, comprehensive aircraft hull, liability and war-risk insurance with respect to the Aircraft as follows:

**14.1** Liability insurance maintained at all times and any other type of insurance required under applicable laws and regulations of the United States;

**14.2** All risk aircraft hull insurance covering the Aircraft maintained at all times for an amount not less than the fair market value of the Aircraft;

**14.3** Intentionally Omitted;

**14.4** All such insurance policies shall: (i) be with insurance companies of recognized responsibility, (ii) name Lessor as the insured owner with respect to the hull and liability insurance, and Lessee as an additional insured with respect to the liability insurance, (iii) name Lessor as

Dry Lease Agreement                                                                              N236CA

"loss payee" as their interests may appear with respect to any hull insurance (except as otherwise required by clause (iv)), and (iv) shall comply with all other insurance requirements of First Fidelity Bank under the mortgage dated on or about 29 December 2023, relating to the Aircraft (the "**Mortgage**").

The Aircraft shall not be operated by Lessee, nor shall Lessee allow the Aircraft to be operated by any other party, at any time, unless and until such insurance policies are in effect. Lessee and Lessor shall consult with each other, from time to time, in determining any additional amounts of insurance that may be advisable with respect to the Aircraft.

15.    **INDEMNITY; LIMITATION OF LIABILITY.**

15.1    Lessee agrees to indemnify and hold harmless Lessor and its respective officers, directors, partners, employees, shareholders, agents and affiliates (collectively, "*Representatives*") from any claim, damage, loss, or reasonable expense (including reasonable attorney's fees) resulting from damage to any property or for bodily injury to or death of any person(s) caused by an occurrence and arising out of Lease Operations and/or Lessee's possession, maintenance or use of the Aircraft during the Lease Term (an "*Indemnified Loss*"); except that Lessee will not be liable for an Indemnified Loss if and only to the extent: (i) such loss is covered by the proceeds from the insurance policies required under **Section 14** hereof; or (ii) of comparative negligence, comparative gross negligence or willful misconduct of Lessor or its Representatives.

15.2    LESSOR AND LESSEE AGREE THAT:

(a) THE PROCEEDS OF INSURANCE TO WHICH IT IS ENTITLED;

(b) ITS RIGHTS TO INDEMNIFICATION UNDER THIS **SECTION 15**; AND

(c) ITS RIGHT TO DIRECT DAMAGES ARISING IN CONTRACT FROM A MATERIAL BREACH OF THE OTHER PARTY'S OBLIGATIONS UNDER THIS AGREEMENT,

ARE THE SOLE REMEDIES FOR ANY DAMAGE, LOSS, OR EXPENSE ARISING OUT OF THIS AGREEMENT OR THE SERVICES PROVIDED HEREUNDER OR CONTEMPLATED HEREBY. EXCEPT AS SET FORTH IN THIS **SECTION 15** EACH PARTY WAIVES ANY RIGHT TO RECOVER ANY DAMAGE, LOSS, OR EXPENSE ARISING OUT OF THIS AGREEMENT OR THE SERVICES PROVIDED HEREUNDER OR CONTEMPLATED HEREBY. IN NO EVENT SHALL LESSOR OR LESSEE BE LIABLE FOR OR HAVE ANY DUTY FOR INDEMNIFICATION TO THE OTHER FOR SUCH OTHER PARTY'S CLAIMED INDIRECT, SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, OR FOR ANY OF SUCH OTHER PARTY'S DAMAGES CONSISTING OF DAMAGES FOR LOSS OF USE, LOSS OF PROFIT OR INSURANCE DEDUCTIBLE, EXCEPT FOR CLAIMS BY LESSOR AGAINST LESSEE FOR REIMBURSEMENT OF THIRD-PARTY BODILY INJURY, DEATH OR PROPERTY DAMAGE.

15.3    NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH IN THIS AGREEMENT OR IN ANY OTHER AGREEMENT TO WHICH LESSOR AND LESSEE ARE A PARTY, LESSEE AGREES TO INDEMNIFY AND HOLD HARMLESS LESSOR AND

REIMBURSE LESSOR FOR ANY UNINSURED DAMAGE OR DIMINUTION IN VALUE OF OR TO THE AIRCRAFT RESULTING FROM DAMAGE THERETO DURING ANY LEASE OPERATION, EXCEPT (I) TO THE EXTENT CAUSED BY THE COMPARATIVE NEGLIGENCE OR WILLFUL MISCONDUCT OF LESSOR OR ITS REPRESENTATIVES OR (II) TO THE EXTENT COVERED BY THE PROCEEDS FROM THE INSURANCE POLICIES REQUIRED UNDER **SECTION 14** HEREOF.

**15.4**    The provisions of this **Section 15** shall survive the termination or expiration of this Agreement.

16.    **DEFAULT; TERMINATION.**

**16.1**    Either Party may terminate this Agreement at any time upon **thirty (30) days** prior written notice to the other Party. This Agreement shall automatically terminate upon sale of the Aircraft.

**16.2**    Lessor may also terminate this Agreement at any time upon an Event of Default by Lessee. The term *"Event of Default"* means any of the following events: (i) Lessee breaches its obligation to pay the Basic Rent or any other sum when due and fails to cure such breach within **ten (10) days**; (ii) Lessee breaches any of Lessee's insurance obligations under **Section 14**; (iii) Lessee breaches any of its other obligations and fails to cure that breach within **thirty (30) days** after written notice from Lessor to Lessee; (iv) any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect when made; (v) Lessee becomes insolvent or ceases to do business as a going concern; or (vi) a petition is filed by or against Lessee under any bankruptcy, insolvency or similar laws and in the event of an involuntary petition, the petition is not dismissed within **forty-five (45) days** of the filing date.

17.    **MISCELLANEOUS.**

**17.1**    **Force Majeure**. Other than with respect to Lessee's payment of Basic Rent and any other obligation of Lessee for payment of amounts due hereunder, neither Party will be deemed to be in breach of its obligations hereunder or have any liability for any delay, cancellation, or damage arising in whole or in part from any act of God, act of nature, acts of civil or military authority, strike or labor dispute, mechanical failure, lack of essential supplies or parts, or for any cause beyond the control of such Party.

**17.2**    Confidentiality. Each Party will use best efforts to hold in confidence any information it may gain regarding the other's business, scheduling or security plans. Each Party shall use any confidential information of the other Party solely for the purpose of this Agreement and shall not disclose any such confidential information in any manner whatsoever except to those of its directors, officers, insurers, employees, agents or advisors who need to know such information in connection with administering and performing this Agreement, including evaluating such Party's rights and obligations under this Agreement. Each Party shall be responsible for compliance with this **Section 17.2** by its Representatives.

**17.3**    **Notices**. Unless otherwise expressly provided by law or herein, all notices, instructions, demands and other communications hereunder shall be in writing and shall be delivered personally or sent by registered or certified mail, postage prepaid and return receipt

requested, or sent by facsimile or portable document format ("**PDF**") transmission (the receipt of which shall be confirmed by the Parties, either by a confirming copy sent by air mail, postage prepaid, or some other manner which confirms receipt of the facsimile), and the date of personal delivery or facsimile or PDF transmission or **five (5) days** after the date of mailing (other than in the case of the mailing of a confirming copy of a facsimile transmission), as the case may be, shall be the date of such notice, in each case to the address or facsimile number of such Party set forth on the signature page hereto (or at such other address and/or facsimile number as such Party shall have furnished to the other in writing).

**17.4    Further Assurances**. Each Party shall execute and deliver to the other such further documents and take such further action as may be necessary to effectuate the intent and purpose of this Agreement.  Exercise of the Parties' rights under this Agreement shall be subject to and conditioned upon, and each Party shall use its best efforts to assist each other in, compliance with applicable laws.

**17.5    Governing Law; Jurisdiction.** This Agreement shall be governed by and construed under the laws of the State of Texas without regard to conflicts of law principles thereof. The Parties hereby submit to the exclusive jurisdiction and venue of any court (federal, state or local) within the State of Texas.

**17.6    Entire Agreement; Amendment**. This Agreement contains the entire Agreement between the Parties with respect to the subject matter hereof. No term or provision of this Agreement may be amended, modified, waived, discharged or terminated orally, but only by a written instrument signed by the Party against which enforcement of such amendment, modification, waiver, discharge or termination is sought. No delay or failure by Lessor to exercise any right under this Agreement shall constitute a waiver of that or any other right hereunder and any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

**17.7    Assignment of Rights**. This Agreement and the rights and obligations of the Parties shall inure to the benefit of, and be binding upon, their respective heirs, devisees, legatees, executors, administrators, trustees, successors, assigns and legal representatives. Lessee may not assign this Agreement (or any of its rights and obligations hereunder) without the prior written consent of Lessor.

**17.8    Headings**. The section headings are inserted only for convenience and do not affect the interpretation of this Agreement.

**17.9    No Partnership; Independent Contractor.** Nothing herein shall in any way create any association, partnership or joint venture relationship between the Parties or be construed to evidence the intention of the Parties to constitute such. Lessor and Lessee shall be considered independent contractors under this Agreement. All persons engaged by Lessee in connection with the Lease Operations and in performance of its obligations under this Agreement shall at all times and for all purposes be considered Lessee's employees or agents, and Lessee shall be solely responsible for payment of all federal, state, and other applicable government, social security, social insurance, unemployment and sickness disability insurance and other payroll taxes with respect to such respective Party's employees, including contributions from them when and as required by law. Lessee agrees to indemnify and save Lessor harmless from any and all claims that

may be made by Lessee's employees under workers compensation laws in relation to the Lease Operations and in Lessee's performance of Lessee's obligations under this Agreement.

17.10  **No Third Party Beneficiary**. No person, other than the Parties, is intended to be a beneficiary of any provisions of this Agreement.

17.11  **Severability**. In the event any of the provisions of this Agreement should, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

17.12  **Attorneys' Fees**. In the event that any suit or action is instituted to enforce any provision in this Agreement, each Party in such dispute shall bear its own fees, costs and expenses of enforcing any right of such Party under or with respect to this Agreement, including, without limitation, such reasonable fees and expenses of attorneys and accountants, including, without limitation, all fees, costs and expenses of appeals.

17.13  **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together constitute one and the same instrument.

17.14  **Subordination.** All rights of Lessee hereunder shall be subject and subordinate to those of First Fidelity Bank under the Mortgage.

17.15  **Special Provisions**. The provisions of **Exhibit C** hereto shall be applicable to this Agreement.

17.16  **Intentionally Omitted.**

17.17  **Lessee may operate this Aircraft in accordance with 14 C.F.R. §91.321.**

[Signature Page Follows]

18. TRUTH IN LEASING. The Aircraft maximum certificated weight is greater than 12,500 pounds.

18.1 LESSEE HAS REVIEWED THE AIRCRAFT'S MAINTENANCE RECORDS AND OPERATING LOGS AND HAS FOUND THAT, DURING THE TWELVE MONTHS (12) PRECEDING THE DATE OF THIS AGREEMENT, THE AIRCRAFT HAS BEEN MAINTAINED AND INSPECTED UNDER PART 91 AND PART 135 OF THE FARS. LESSEE CERTIFIES THAT THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED UNDER FAR PART 91 AND PART 135 FOR OPERATIONS TO BE CONDUCTED UNDER THIS AGREEMENT.

18.2 LESSEE CERTIFIES THAT LESSEE AND NOT LESSOR IS RESPONSIBLE FOR OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THIS AGREEMENT DURING EACH LEASE OPERATION, LESSEE FURTHER CERTIFIES THAT LESSEE UNDERSTANDS HIS RESPONSIBILITY FOR COMPLIANCE WITH APPLICABLE FARS DURING EACH LEASE OPERATION.

18.3 LESSEE UNDERSTANDS THAT AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND THE PERTINENT FARS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE.

18.4 LESSEE CERTIFIES AND AGREES THAT A TRUE COPY OF THIS AGREEMENT SHALL BE CARRIED ON THE AIRCRAFT AT ALL TIMES DURING EACH LEASE OPERATION AND SHALL BE MADE AVAILABLE FOR INSPECTION UPON REQUEST BY AN APPROPRIATELY CONSTITUTED INDENTIFIED REPRESENTATIVE OF THE FAA.

The Parties have executed this AIRCRAFT DRY LEASE AGREEMENT as of the date first written above.

LESSOR:                                    LESSEE:


CYPRESS COVE AIR, LLC                       EMPYREAL JET, INC.
An Arizona Limited Liability Company        a Texas corporation


By: _____        By: _____

Name:                                       Name: Elsa C. Bell
Title:                                      Title: President

Address:                                    Address:
22510 North 18th Drive                      397 N. Same Houston Parkway, Suite 475
Phoenix, AZ United States 85027             Houston, TX 77077


Dry Lease Agreement                                                    N236CA

## EXHIBIT A

## AIRCRAFT DRY LEASE AGREEMENT

## DELIVERY CONDITIONS

In addition to the requirements set forth in **Section 2** of the Agreement, Lessor shall deliver the Aircraft to Lessee in compliance with the following provisions (the "***Delivery Conditions***"):

(1)     The Aircraft shall be airworthy and have been maintained in accordance with **Section 7** of the Agreement and in compliance with FARs Part 91 and Part 135 and all other applicable FAA regulations.

(2)     The Aircraft exterior shall have been washed and the interior shall be clean.

(3)     The Aircraft shall have installed the full complement of engines and other equipment, parts, components, accessories and loose equipment as would be necessary for Lessee to operate the Aircraft in accordance with its intended use.

(4)     The Aircraft shall comply with all outstanding U.S. FARs and Airworthiness Directives issued by the FAA affecting such model aircraft, engines, and components that by their terms require compliance on or before the date of the Lease Operations.

(5)     When the Aircraft is delivered to Lessee, all Aircraft systems (including galleys, passenger and cargo compartments) shall be fully operational for their intended functions.

Dry Lease Agreement                                                                                    N236CA

## Exhibit B

## AIRCRAFT DRY LEASE AGREEMENT

## RETURN CONDITIONS

In addition to the requirements set forth in **Section 11** of the Agreement, Lessee shall return the Aircraft in compliance with all of the following provisions (the "***Return Conditions***"):

(1)    The Aircraft shall have been maintained and operated in accordance with **Sections 7** and **8** of the Agreement and in compliance with FARs Part 91 and Part 135 and all other applicable FAA regulations.

(2)    The Aircraft exterior shall have been washed and the interior shall be clean.

(3)    The Aircraft shall have installed the full complement of engines and other equipment, parts, components, accessories and loose equipment as were delivered to Lessee at the commencement of the Lease Operations.

(4)    The Aircraft shall be in as good operating condition as when delivered to Lessee hereunder, ordinary wear and tear excepted. Those items of the Aircraft that are damaged shall be replaced or repaired by Lessee.

(5)    The Aircraft, except as otherwise provided in the Agreement or as consented to by Lessor, shall be in the same configuration (including, but not limited to, interior seating configuration, galleys and lavatories) as when the Aircraft was originally delivered to Lessee hereunder.

(6)    All records, logs, materials, manuals and data associated with the Aircraft, including without limitation, inspection, modification and overhaul records required to be maintained with respect to the Aircraft under the applicable rules and regulations of the FAA or the applicable manufacturer's recommended maintenance program, including those acquired or prepared by Lessee during the Lease Term shall be returned with the Aircraft.

(7)    All aircraft systems (including galleys, passenger and cargo compartments) shall be fully operational for their intended functions. Lessee shall operationally check all systems at the time of return of the Aircraft and shall report all defects found to Lessor.

EXHIBIT C

# AIRCRAFT DRY LEASE AGREEMENT

## FINANCIAL TERMS

Basic Rent (per month)　　　= **$50,000.00 per month, due on the 1st of each Month**

**Engine Reserves**　　　= **$1,000.00 per engine hour, due on the 1st of each Month**

The following items shall be the responsibility of the Lessee ("Lessee Expenses"):
- NAV & FMS Subscription
- Traxxall Maintenance Tracking
- Insurance
- WiFi